IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROBERT BALLARD, | } | |
| TDCJ-CID NO.1534846, | } | |
| Plaintiff, | } | |
| v. | } | CIVIL ACTION H-08-0567 |
| HEDWIG VILLAGE POLICE | } | |
| DEPARTMENT, *et al*., | } | |
| Defendants. | } | |

OPINION ON PARTIAL DISMISSAL

Plaintiff Robert Ballard, a state inmate incarcerated in the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID"), proceeding *pro se* and *in forma pauperis*, filed this civil rights complaint alleging that law enforcement personnel violated his civil rights while effectuating his arrest. Defendants Steven Wayne Packard, Dale Edward Lusk, and Frank Schulgen have filed a motion for summary judgment and defendant D.R. Neck has filed a motion for summary judgment.[1] Plaintiff has also filed a summary judgment motion. For the reasons to follow, the Court will grant defendants Lusk, Packard, and Schulgen's motion for summary judgment, and grant in part and deny in part defendant Neck's and plaintiff Ballard's motions for summary judgment.

BACKGROUND

Law enforcement officers from the Hedwig Village Police Department ("HVPD"), Spring Valley Police Department ("SVPD"), and Memorial Villages Police Department ("MVPD") were dispatched to an office building around 1:30 a.m. of September 23, 2007, to investigate a possible burglary. (Docket Entries No.50, page 2; No.52-4, page 3). While searching the first floor of the building, HVPD Officers Dale Lusk and Frank Schulgen

---

[1] The Court did not order service of process on the other defendants to this suit.

1

and SVPD Sgt. Warren G. Obenland saw a suspect going up a stairwell; not knowing the number of suspects or whether they were armed, the officers requested a K-9 team to facilitate a search of the building.   (Docket Entries No. No.14, page 31; No.50, pages 2, 6; No.50-3, page 2).   Shortly thereafter, the City of Houston Police Department ("HPD") K-9 team, consisting of Officer D.R. Neck and the canine Artus, joined Lusk, Schulgen, and MVPD Officer Webb ("the attending officers") in their search of the building.   Within fourteen minutes or less after the K-9 team arrived at the building, HVPD Officer Lusk advised SVPD Sgt. Obenland that plaintiff was in custody.   (Docket Entries No.14, page 7; No.50, pages 2, 6; No.50-3, page 2; No.52-14; No.52-15; No.52-17, page 3; No.56-8, pages 5-6).   Two minutes later, Lusk requested an ambulance to treat a dog bite wound.   (Docket Entry No.50-3, page 2).   MVPD Officer Webb escorted plaintiff down two flights of stairs to a patrol car.   (Docket Entries No.50, pages 3, No.52-17, page 5; No. 56-8, page 10).   Within minutes, medics were on the scene and examined plaintiff.   (Docket Entry No.70, page 6).   The K-9 team and Lusk continued the search of the third floor of the building to determine if there were other hidden suspects; finding no others the K-9 team walked down the stairs to the patrol vehicle.   (Docket Entries No.50, page 3; No.52-17, pages 5-6).

From the patrol car, SVPD Sgt. Obenland observed that plaintiff's facial features were similar to those of a suspect in another burglary in the area and he asked plaintiff at the scene if he was the same person.   (Docket Entry No.50-3, pages 2-3).   Plaintiff denied his involvement.   (*Id.*).   HVPD Officer Lusk drove plaintiff to the Hedwig Village Jail ("HV Jail"). (*Id.*, page 3).   Obenland met plaintiff at the HV Jail, where he photographed plaintiff and the tools recovered from the burglary for the SVPD's investigation of the prior burglary.   (*Id*).

Plaintiff refused to talk with Obenland about the prior burglary without an attorney present. (*Id.*).

HVPD Detective Steven Packard was called to investigate the September 23, 2007 burglary and to see if it was connected with a string of burglaries in the area. (Docket Entry No.50, pages 8-9). After viewing the scene and meeting with the owner of the building, Packard attempted to interview plaintiff at the HV Jail. (*Id.*, page 9). Plaintiff indicated that without an attorney, he had nothing to say. (*Id.*). Packard retained a water bottle from which plaintiff had been drinking to possibly obtain DNA evidence because he suspected plaintiff had committed other burglaries. (Docket Entries No.14, page 15; No. 50, pages 8-9; No.56-6, page 9).

Around 12:30 p.m. the same day, HVPD Officer Bill Wright transferred plaintiff to the Harris County Jail ("HC Jail"), where an on-duty nurse advised Wright to have medical personnel at Ben Taub Hospital examine plaintiff's injuries. (Docket Entry No.50-4, page 5). Wright transported plaintiff to the hospital and waited with him in the emergency room until he was relieved by HVPD Officer Carlos Gallo. (Docket Entry No.50-4, pages 1, 5). Plaintiff was examined by medical personnel and his wounds treated. (Docket Entry No.54-3, pages 6, 8. 11). HVPD Officer Jaime Exley relieved Gallo and later transported plaintiff to the HC Jail, where he was pronounced "fit for jail." (Docket Entry No.50-4, pages 3-4).

On October 13, 2008, plaintiff was convicted, upon a plea of guilty, to burglary of a building with the intent to commit theft in cause number 1184428 in the 263rd District Court of Harris County, Texas. (Docket Entry No.52-7). He was sentenced to six years confinement in TDCJ-CID. (*Id.*).

In the pending action, plaintiff claims that the attending officers and the K-9 officer executed a plan by which the police dog Artus attacked plaintiff after plaintiff was cuffed and compliant because of some racial animus and then conspired to cover up their "hate crime" by falsifying police reports.  (Docket Entries No.1, No.9, No.17).  Plaintiff also claims he was denied medical care for his injuries at the scene and during his detention in the HV Jail.  (*Id.*). Plaintiff seeks a public apology from the attending officers and Officer Neck, termination of their employment, and an order directing that criminal charges be filed against them.  (Docket Entry No.1).  He also seeks compensatory and punitive damages from the following defendants:

1.  The City of Houston for the excessive force used by Officer Neck and the canine, for falsifying reports, and for its policies, customs, and training regarding the use of deadly and excessive force;

2.  HPD Chief Harold Hurtt for gross negligence in managing police personnel, for failing to take appropriate disciplinary action after learning of civil rights violations, and for continuing polices with respect to training and supervision of police personnel;

3.  HPD Officer D.R. Neck for all of plaintiff's injuries resulting from the excessive force assault and for falsifying police reports;

4.  The City of Hedwig Village for plaintiff's injuries while plaintiff was in HVPD's custody resulting from the use of excessive force, for failing to provide him with medical services, and for implementing policies resulting in poor training and supervision of police officers;

5.  HVPD Chief Dave M. Barber for gross negligence in managing police personnel, for failing to take appropriate disciplinary action after learning of civil rights violations, and for continuing polices with respect to training and supervision of police personnel;

6.  HVPD Detective Steven Wayne Packard for denying plaintiff medical treatment while conducting an illegal interrogation and illegal search and seizure from the water bottle and for falsifying a police report;

4

7.     HVPD Officer Dale Edward Lusk, the arresting officer, for participating in the excessive force assault, denying medical treatment, and falsifying police reports and records;

8.     HVPD Officer Frank Schulgen, the officer assisting in the arrest, for participating in numerous civil rights violations and for failing to prevent, stop, or report the use of excessive force and denial of medical treatment;

9.     The City of Spring Valley for the failure of its employees to stop the use of excessive force and to report the civil rights violations;

10.    SVPD Chief Gary Finkleman for gross negligence in managing police personnel;

11.    SVPD Sgt. W.G. Obenland for failing to report unlawful acts and to prevent or stop such violations, for participating in the cover-up, for conducting an illegal interrogation and photographing plaintiff with knowledge that plaintiff needed medical treatment;

12.    SVPD Officer H. Kincaid for failing to prevent, stop, or report civil rights violations and for participating in the cover-up;

13.    Memorial Villages Police Department ("MVPD") for the failure of its officers to take appropriate action by preventing, stopping, or reporting unlawful acts and for its policies that result in poor training and supervision of police personnel;

14.    MVPD Chief John Doe for gross negligence in managing police personnel who are responsible for civil rights violations;

15.    MVPD Officer Webb for failing to prevent, stop, or report violations and for participating in the cover-up; and,

16.    MVPD Officers John Does for failing to prevent, stop, or report violations and for participating in the cover-up.

(Docket Entries No.1, No.17).

MVPD defendants Lusk, Schulgen, and Packard move for summary judgment on grounds that they are entitled to qualified immunity, *i.e.,* their actions were not objectively unreasonable either to the use of force, the arrest, or with securing medical care for plaintiff.

5

(Docket Entry No.48).  HPD defendant Neck seeks a dismissal of plaintiff's claim that he actively participated in a cover-up by falsifying reports on grounds that such claim is barred by *Heck v. Humphrey*.  (Docket Entry No.32).  Neck also moves for summary judgment on grounds that plaintiff has not stated a viable claim for his injuries and that plaintiff's conspiracy claim regarding a police cover-up does not survive a *Heck v. Humphrey* challenge.  (Docket Entry No.52).  Neck has also asserted the defense of qualified immunity and filed a counterclaim seeking attorney's fees.  (*Id.*).

Plaintiff moves for summary judgment on the ground that there are no issues of material fact with respect to the facts alleged in his pleadings.  (Docket Entry No.56).

## DISCUSSION

To be entitled to summary judgment, the pleadings and summary judgment evidence must show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

A plaintiff seeking relief under 42 U.S.C. § 1983 must establish two essential elements:  that the conduct complained of was committed under color of state law, and that the

6

conduct deprived the plaintiff of rights secured by the Constitution or laws of the United States. *Hernandez v. Maxwell*, 905 F.2d 94, 95 (5th Cir. 1990).

Falsified Records and Conspiracy to Cover-Up

Plaintiff contends because he is African-American, K-9 Officer Neck and the attending officers allowed the police dog to bite him after he was cuffed and compliant and conspired to cover this "hate crime" by falsifying their police reports.  (Docket Entry No.17).  In his motion for summary judgment, plaintiff alleges that "defendants falsified reports to cover-up their civil rights violation and hate crimes."  (Docket Entry No.56, page 12).

The mere existence of a falsified police report does not, by itself, violate a plaintiff's federal rights.  *Nowell v. Acadian Ambulance Serv.*, 147 F.Supp.2d 495, 505 (W.D. La. 2001).  "[T]here is no right to a completely accurate police report."  *Smith v. Patri*, 99 Fed. Appx. 497 (5th Cir. 2004).  However, a conviction obtained by a knowingly false police report violates the criminal defendant's due process rights; therefore, a police officer who files a false police report upon which a conviction is obtained does not enjoy qualified immunity.  *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008).  Plaintiff does not allege that he was wrongfully convicted of burglary based on these reports.

Plaintiff, nevertheless, claims that discrepancies between the original incident reports and the officers' affidavits prove that the incident reports were falsified.  (Docket Entry No.56).  The "discrepancies and omissions" to which plaintiff cites the court are minor and do not constitute probative evidence that Officers Lusk, Neck, or any other defendant falsified the police reports.

Plaintiff also claims that Neck failed to mention the use of force in the September 23, 2007, Houston Police Patrol Canine Outside Agency Request (Details of Deployment) and the September 24, 2007, HPD Information Report or any other report.  (Docket Entry No.56, page 8, citing to Docket Entry No.56-4, pages 4-6).  The record, however, reflects that Officer Neck generated three reports on September 24, 2007, in which he referenced the work of the canine team in searching the building for a burglary suspect.  (Docket Entries No.52-14, 52-15, No.52-16).

Plaintiff's contention that Neck and the attending officers conspired to falsify the police records to cover their alleged "hate crime" and civil rights violation is also speculative and conclusory.  To establish a § 1983 cause of action based upon conspiracy, a plaintiff must allege facts that, liberally construed, establish (1) defendants' participation in a conspiracy involving state action, and (2) a deprivation of his civil rights in furtherance of the conspiracy by a party to the conspiracy.  *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Martin v. Thomas*, 973 F.2d 449 (5th Cir. 1992).  Plaintiff must also show that the conspirators had an agreement to commit an illegal act that resulted in the plaintiff's injury.  *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982); *Thomas v. City of New Orleans*, 687 F.2d 80, 83 (5th Cir. 1982).

Other than plaintiff's claim that the attending officers (but not Neck) taunted him with racial slurs before the dog bit him and his observation that the officers were huddled together and talking as he lay in the back seat of the patrol car, plaintiff states nothing to show that the officers engaged in any kind of discussion or made any kind of agreement to cover their "alleged civil rights violation or hate crime" by falsifying police records.  (Docket Entry No.17).

Defendants Neck's and Lusk's summary judgment records show that the attending officers and Neck did not know each other, had not worked together before the incident, and have not spoken since the incident.  (Docket Entries No.50, pages 2-3; No.52-17, pages 3, 6).  Neck attests that no one "ordered nor suggested to me that the canine assault" plaintiff and that he was not involved in any conspiracy to cover up a hate crime.  (Docket Entry No.52-17, page 6).  Officer Lusk attests that he did not order or direct the dog to attack or use force against plaintiff and that the officers did not discuss the canine force before the event because there was not time for such discussion.  (*Id.*, page 3).  Plaintiff presents nothing to contravene this summary judgment proof.

Moreover, the record reflects that no officer has been charged with a criminal offense for his conduct in effectuating plaintiff's arrest in the office building that plaintiff burgled.[2]  This Court lacks the authority to subject a person to criminal prosecution.  *See U.S. v. Jones*, 287 F.3d 325, 334 (5th Cir. 2002) (observing that the authority to determine whether a person is subject to prosecution for a criminal offense lies solely with state or federal prosecutors).  Therefore, plaintiff's request that the Court order that criminal charges be filed against defendants will be denied.

Without more, plaintiff's claims of falsified records and a conspiracy are conclusory, unsupported, and insufficient to raise a genuine issue of material fact precluding summary judgment.  Defendants are entitled to summary judgment dismissing plaintiff's claims

---

[2] The Court observes that the Texas Hate Crimes Act applies only to enhance punishment after a criminal trial where the fact-finder enters an affirmative finding that the conduct was motivated by a bias or prejudice.  *See* TEX. CODE CRIM. PROC. ANN. art. 42.014; TEX. PEN. CODE ANN. § 12.47.  Furthermore, HPD K-9 Officer Neck attests that he did not commit a hate crime against plaintiff and that he was not involved in any conspiracy to cover up a hate crime.  (Docket Entry No.52-17, page 6).

that defendants engaged in a hate crime and conspired to cover-up the crime by falsifying police reports.  Plaintiff's motion for summary judgment on this ground will be denied.

## Qualified Immunity

Defendants assert the affirmative defense of qualified immunity for monetary damages against them in their individual capacities.  (Docket Entries No.48, page 2; No.52, page 4).  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 199-200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident."  *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008) (footnote omitted).  The Court has discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, – U.S. –, 129 S.Ct. 808, 818 (2009).

## Excessive Force

Plaintiff claims that K-9 Officer Neck ordered the canine Artus to bite him after he was cuffed and compliant and that such gratuitous use of force violates the Fourth Amendment.  (Docket Entry No.17, page 3).  He also charges that Officers Lusk and Schulgen were willing participants in the use of force because they "did not attempt to prevent, stop, or

report excessive force." (*Id.*).  Plaintiff moves for summary judgment on grounds that the officers' actions were racially motivated, deliberate and inspired by malice; he also contends the officers' actions constitute an "abuse of official power that shocks the conscience." (Docket Entry No.56, page 9).

Defendants HVPD Officers Lusk and Schulgen move for summary judgment on grounds that the only force used against plaintiff, other than the force Lusk used to handcuff him, was the force expended by the dog to persuade plaintiff to comply with the officers' commands. (Docket Entry No.49, page 8).  Lusk and Schulgen maintain the dog was solely directed by HPD Officer Neck and that they had neither the ability nor did they try to direct the dog to attack plaintiff. (*Id.*, pages 5, 8-9).

HPD Officer Neck moves for summary judgment on grounds that plaintiff's claims of physical injuries are not supported by his medical records or the videotape of the events following the arrest.  (Docket Entry No.52, pages 14-17).  Neck contends that the police dog was the only "employee" that made contact with plaintiff and that plaintiff misinterpreted the procedures employed by Neck to disengage the canine.  (*Id.*, pages 17-21).

Claims of excessive force during the course of an arrest are analyzed under the Fourth Amendment and its "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force claim is an objective one:  the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397.  In that regard, a certain amount of force is obviously reasonable when a police officer apprehends a dangerous, fleeing suspect.  *See Scott v.*

11

*Harris*, 559 U.S. 372 (2007).   To establish a claim of excessive force under the Fourth Amendment, a plaintiff must demonstrate that he has been seized and that he sustained an injury, which resulted directly and only from a use of force that was clearly excessive to the need, and the force used was objectively unreasonable. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004).   "In evaluating excessive force claims, courts may [also] look to the seriousness of injury to determine 'whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur.'" *Deville v. Marcantel*, 567 F.3d 156, 168-69 (5th Cir. 2009) (quoting *Brown v. Lippard*, 472 F.3d 384, 386-87 (5th Cir. 2006) (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986))).

In gauging the objective reasonableness of the force used by a law enforcement officer, the Court must balance the amount of force used against the need for that force. *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).   At issue, "is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397.   In applying this standard, courts are also directed to consider "the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97.   Thus, in analyzing an excessive claim, courts are directed to "[pay] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.   The courts, therefore, must judge

"reasonableness" from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Plaintiff concedes and the record affirmatively shows no police officer at the scene, other than Artus, the canine, used unnecessary physical force against plaintiff either before or after he was cuffed and compliant. (Docket Entries No.56-9, page 9; No.50-5, pages 12-13). Artus was under the direct control of HPD K-9 Officer Neck and no other. (Docket Entries No.52-17, page 6; No.52-18, page 6). By plaintiff's own account, the officers did not physically touch him except to cuff him. Furthermore, the record shows that neither Lusk, Schulgen nor the other attending officers commanded Artus to bite plaintiff nor could they command Artus to bite plaintiff. Artus took directions from Officer Neck alone. Furthermore, as previously discussed, the record does not support plaintiff's allegation that Neck, Schulgen, Lusk or any of the attending officers engaged in a conspiracy to facilitate a malicious dog attack. Defendants Lusk, Schulgen, and the other attending officers are, therefore, entitled to summary judgment on plaintiff's excessive force claim.

At issue then, is whether Officer Neck used excessive force through Artus in violation of the Fourth Amendment. The record, viewed in the light most favorable to plaintiff, reflects that after Lusk handcuffed plaintiff and he lay compliant on the floor of the hallway, Lusk and the attending officers stepped back and K-9 Officer Neck whispered something to Artus and pushed the dog toward plaintiff[3]; the canine then bit plaintiff for a couple of minutes.[4] Thereafter, plaintiff saw Neck grab the dog about his mouth to force the dog to disengage.[5]

---

[3] Plaintiff, however, is unclear as to what Officer Neck whispered to Artus. Plaintiff attests that the noise made by his screams and the attending officers' taunts was such that he could not hear things clearly. (Docket Entry No.56-8, page 8). Plaintiff attests that he saw Neck whisper something but he did not hear what Neck whispered to the canine. (*Id.*, pages 33, 34). Moreover, he is not sure if Officer Neck said anything to the dog. (Docket Entry No.56-10, page 1).

Plaintiff suffered an injury to his left calf from the dog bite although not to the extent that he alleges.  Medical records from Ben Taub Hospital and the HC Jail, which plaintiff does not contravene, show that he suffered two small puncture wounds to his left calf; the wounds were treated with routine wound care and an antibiotic.[6]  According to Neck's canine

---

[4] Plaintiff attests that once on the floor and while being handcuffed, he looked back toward his feet, where he saw Neck at the threshold of the office door, with his arm around Artus.  (Docket Entry No.56-8, page 8).  After the attending officers patted down plaintiff's back and sides and cuffed him, plaintiff saw the attending officers immediately step back.  (Docket Entries No.56-8, page 38; No.56-9, pages 9-10).  They taunted him with negative remarks and racial slurs and he screamed, although he does not say why.  The noise was such that plaintiff could not hear things clearly.  (Docket Entry No.56-8, page 8).  Plaintiff then saw Neck whisper something in the dog's ear and push the dog toward plaintiff.  (*Id*.).  The dog began to bite plaintiff.  (Docket Entries No.56-8, page 7; No.56-11, page 5).  Although only plaintiff's hands were cuffed, plaintiff could not move; he could only jerk up and down.  (Docket Entries No.56-9, page 11; No.56-10, page 1).  No one told him to stop moving.  (Docket Entry No.56-11, page 6).

Plaintiff estimates the attack lasted "a couple of minutes although he acknowledges that "it's kind of like time stood still." (Docket Entry No.56-8, page 7).  Plaintiff indicates that two minutes is a guess because he "couldn't put a time frame on it." (Docket Entry No.56-11, page 5).

[5] Still looking back, plaintiff attests that he saw Neck standing parallel to plaintiff's legs; Neck grabbed the dog by its face.  (Docket Entry No.56-10, page 1).  Neck said something twice to the dog before he grabbed the dog about its mouth to force it to stop biting.  (Docket Entry No.56-8, pages 10-11).  Neck did not stick his hand in the dog's mouth; he grabbed around the dog's mouth and pried it open.  (*Id*., pages 33-34).

[6] Plaintiff contends he sustained several bites on his left calf that were at least an inch in depth.  (Docket Entry No.56-8, page 18).  Plaintiff states that he had dressing changes to his wounds for at least twenty-one days while he was confined in the HC Jail.  (Docket Entry No.56-10, pages 2-3).  Thereafter, plaintiff claims he changed the dressings himself for a month to two months.  (*Id*.).  He claims that he had to walk cautiously to prevent the wounds from reopening and to stop the bleeding.  (*Id*.).  He states that he was given Naproxen for pain for the dog bite.  (*Id*., pages 4-5).

The certified Ambulance Record of the Village Fire Department, dated September 23, 2007, reflects that plaintiff sustained "[s]mall abrasions and a puncture wound" to his calf, which were treated at the scene around 2:20 a.m. and dressed with 4 x 4's and kerlix.  (Docket Entry No.70, page 7).  Almost twelve hours later, around 1:45 p.m. on September 23, 2007, plaintiff was admitted to the emergency clinic at Ben Taub Hospital with a puncture wound to the left leg.  (Docket Entry No.54-3, page 6).  Plaintiff was examined later that afternoon.  (Docket Entry No.54-3, pages 6, 8).  Medical personnel noted two puncture wounds less than 1 cm each on his left leg.  (*Id*., page 8).  No swelling, numbness, loss of function, or massive or active bleeding were noted.  (*Id*.).  Plaintiff was ambulating.  (*Id*.).  The wounds were cleaned and the antibiotic Augmentin was prescribed.  (*Id*., pages 8, 11).  Plaintiff complained to nurses of severe "7/10" pain in his lower left leg from dog bites.  (*Id*., page 11).  By 7:00 p.m., no pain was noted.  (*Id*.)  At 10:45 p.m., plaintiff was given the Augmentin.  (*Id*.).  Plaintiff was discharged from Ben Taub emergency clinic to the HC Jail in good condition with a diagnosis of a dog bite.  (Docket Entries No.54-3, page 11, No.50-4, page 3).

The police officers who accompanied plaintiff while he was in the emergency clinic attest that plaintiff did not need any assistance walking and did not complain of any pain or discomfort.  (Docket Entry No.50-4, pages 2, 4, 6).  Two

14

expert Greg Bisso, whose affidavit plaintiff does not refute, such wounds reflect "a very shallow contact and the dog reattaching to the suspect's clothing to keep the suspect from fleeing or attempting to attack the officer."  (Docket Entry No.52-18, page 5).  Plaintiff also surmises that he injured his back as he struggled with the dog, but his medical records do not reflect that his intermittent, nonspecific back pain is directly attributable to this incident.[7]

        HPD Officer Neck attests that after plaintiff was compliant but before he was handcuffed, Neck "bent down and took hold of the canine's collar and gave the release command," not the bite command.  (Docket Entry No.52-17, page 4).  Neck attests that Artus, who had previously engaged plaintiff before plaintiff complied with orders, released his hold on

---

of the officers observed the wounds on plaintiff's left calf and described them as little puncture marks.  (*Id*., pages 1, 3).  One officer attests that he did not observe any blood from or around the wound.  (*Id.*, pages 1-2).

Around 12:10 a.m., on September 24, 2007, soon after he was admitted to the HC Jail, plaintiff was given a long-term assignment to a bottom bunk because of a medical problem that he had identified.  (Docket Entry No.59-2., page 14).  The medical problem was not noted.  A health questionnaire from the Harris County Sheriff's Department, dated September 24, 2007, at 9:18 a.m., reflects that plaintiff suffered from a dog bite to his left leg that required a medical evaluation and that he was currently taking prescription medication.  (Docket Entry No.59-2, page 3).  Progress notes from the Harris County Sheriff's Office Health Services Bureau dated September 24, 2007, at 5:05 p.m., reflect that plaintiff complained of a dog bite to his left lower leg that had been treated in the emergency room with Augmentin.  (Docket Entry No.59-2, page 17).

Plaintiff informed medical personnel at the HC Jail that he suffered lower back pain, for which he took Flexeril and Tylenol No.3.  (Docket Entry No.59-2, page 17).  Medical personnel observed an open puncture wound on his calf and diagnosed him with a dog bite to his left calf area and chronic back pain.  (*Id.*).  The physician prescribed Flexeril, Augmentin, Naproxen, Norvace, and HCTZ.  (*Id.*).  The prescriptions were again noted on medical records dated September 25, 2007 at 8:30 p.m.  (*Id.*).

A health assessment from the HC Jail medical services department dated October 2, 2007, shows that plaintiff was taking Amoxil, Naproxen, Flexeril, HCTZ, and Norvase.  His chief complaint was an open wound on his dorsal left leg from a dog bite.  (Docket Entry No.59-2, pages 9, 10).  The wound was cleansed and 2 x 2 tape was applied.  (*Id*., page 10).  An order was issued to repeat the cleansing procedure for ten days.  (*Id.*).  Wound treatment notes reflect medical personnel observed a moderate discharge of blood from the wounds on October 3 and 4, 2007, and a scant amount thereafter until the treatment ceased on October 17, 2007.  (Docket Entry No.59-2, page 6).  The notes also reflect that plaintiff complained of pain at a level 2 on a scale of one to ten.  No swelling was noted.  (*Id.*).  HC Jail medical records also reflect that on October 3rd and 13th, plaintiff was referred for medication non-compliance counseling for refusing to take the Flexeril.  (Docket Entry No.59-2, pages 18, 25).

[7] Plaintiff "assumes" that he injured his lower back when he jerked up and down as the dog bit him.  (Docket Entry No.56-9, page 11).  Although medical personnel at the HC Jail prescribed Flexeril to treat the back pain for ninety days, plaintiff refused to take it because he did not think it was doing any good.  (Docket Entry No.56-10, pages 4-5, 11).  Plaintiff indicates that his back pain was intermittent.  (*Id.* pages 4-5).

plaintiff but not his hold on the leg of plaintiff's pants because the dog's teeth had become entangled in the fabric of plaintiff's pants; consequently, Neck "reasserted the release command and put [his] hand under the police canine's mouth near his throat to assist in opening his mouth to remove the entangled material in the canine's teeth." (*Id.*). The fabric on plaintiff's pants leg was shredded from the dog bites. (Docket Entry No.56-8, page 18). Neck also attests that because of the sensitivity of the dog's hearing, he spoke in a normal tone of voice to Artus to give the command to release. (*Id.*).

Canine expert Greg Bisso attests that HPD canines "are trained to react to the situation," but they are specifically trained to "bite and hold" when extracting a suspect and to maintain its hold of the suspect until it is given the command to release. (Docket Entry No.52-18, pages 3, 6). Bisso also attests that even after a dog has searched and located a suspect, he is in defense mode and is still protective of his handler and other officers even after the dog has been ordered to release. (*Id.*, page 5). Bisso further attests that "even though the dog is given the command to release, the dog must be held back until the situation is rendered safe. A safe situation means the suspect is handcuffed and any weapons have been removed from the suspect." (*Id.*).

Officer Neck's actions are consistent with the expert's opinion that the canine should be restrained until the situation is rendered safe. Both Neck and plaintiff report that Neck held Artus by the collar until plaintiff became compliant. Both agree that thereafter, Neck gave Artus a command and released his hold on the dog. Although plaintiff perceived Neck's actions to be otherwise, the record does not affirmatively show that Neck commanded Artus to bite plaintiff. Neck's commands and his actions in assisting the dog in disengaging from plaintiff's

clothing are consistent with plaintiff's statements regarding Neck's use of his hands to pry open the dog's mouth and with the state of plaintiff's clothing.

Artus's actions are also consistent with the expert's statements regarding the dog's defensive and protective nature.  Under plaintiff's account, the scene was loud and noisy after he was cuffed and searched; the attending officers immediately stepped back and yelled taunts and he screamed.  From the noise and sudden action of the attending officers, the dog may have simply reacted to the situation when released by Neck.  The wounds that plaintiff suffered, although initially painful, reflect shallow contact with the canine's teeth and the canine's attempt to keep the suspect from fleeing or attempting to attack an officer.

Nevertheless, disputed issues such as when Artus initially engaged and released his hold on plaintiff's leg, the duration of the bite, and the timing of the commands given by Neck preclude a finding on whether Neck used excessive force via Artus and whether such force was objectively reasonable.  "Determination of the objective reasonableness of an officer's conduct requires this Court to "settle[e] on a coherent view of what happened in the first place." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994) (internal citation and quotation omitted). Disputed issues of material fact therefore prevent judgment as a matter of law that defendant Neck did not use excessive force in violation of plaintiff's Fourth Amendment rights.  The parties' submissions, when viewed in the light most favorable to the plaintiff, establish that plaintiff has met the threshold requirement of showing a violation of his constitutional rights.

Summary judgment based on the second step of qualified immunity, however, is appropriate "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." *Saucier v. Katz*, 533 U.S. 197, 202 (2001).  To evaluate the "clearly established law"

prong of the qualified immunity test, the court must ask whether, at the time of the incident, the law clearly established that such conduct would violate the right. *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004). This inquiry focuses not on the general standard but on the specific circumstances of the incident. *Id.* "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202. Moreover, the conduct at issue must not fall "in the hazy border between excessive and acceptable force." *Brousseau*, 543 U.S. at 201. "Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 383 n.1 (5th Cir. 2009) (citing *Brousseau*, 543 U.S. at 201 and *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)). The Fifth Circuit has noted that "[c]aselaw from this circuit (and, of course, from the Supreme Court) is the best way to determine whether a right was clearly established." *Graves v. Zachary*, 277 Fed. Appx. 344 n.4 (5th Cir. 2008). On the other hand, "in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brousseau*, 543 U.S. at 199.

The right to be free from the use of excessive force in effecting an arrest was clearly established at the time defendants arrested plaintiff. *See Graham v. Connor*, 490 U.S. 386, 395-96 ( 1989). A reasonable officer could conclude that a law enforcement officer who allows his police dog to bite an essentially helpless inmate during a prison shakedown without provocation violates the Fourth Amendment. *Kesler v. King*, 29 F.Supp.2d 356, 372-73 (S.D. Tex. 1998); *see also Dunn v. Nance*, CV-08-23-S-BLW, 2009 WL 1956429 (S.D. Idaho, July 6, 2009) (concluding that police dog bite for over one minute could violate Fourth Amendment if as

18

plaintiff alleges, he was lying flat on ground, not resisting, with arms outstretched).  Even if case law does not clearly establish plaintiff's rights under these facts, the Court holds that no reasonable officer could conclude that the release of the police dog under the facts alleged by plaintiff was constitutionally permissible.  Accordingly, defendant Neck is not entitled to summary judgment on the defense of qualified immunity.

Plaintiff also claims that Officers Lusk and Schulgen and the other attending officers failed to protect him from the allegedly excessive force after he was handcuffed, subdued, and compliant.  An officer may be liable under § 1983, under a theory of bystander liability, if he (1) knows that a fellow officer is violating an individual's constitutional rights, (2) has a reasonable opportunity to prevent harm, and (3) chooses not to act.  *Randall v. Prince George's Cty., Md.,* 302 F.3d 188, 203-04 (4th Cir. 2002); *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995).  The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer.  *Id.*, 302 F.3d at 204 n. 24.

The record affirmatively shows that Officers Lusk, Schulgen, or any other attending officer, did not have a reasonable opportunity to prevent any harm to plaintiff from the dog bite.  Plaintiff states that use of force occurred immediately after he was cuffed and lasted for approximately two minutes.  Without question, the canine was under the direct control of Officer Neck and no other.[8]  In fact, the canine did not understand English and was trained to

---

[8] Officer Neck attests to the following, in pertinent part:

> I never gave anyone at the scene any care or custody of my canine partner, Artus.  Further, no Hedwig Village or Spring Valley police officer directed my canine partner to assault Mr. Ballard.  My canine partner Artus does not understand English and has very specific one word commands to do the different tasks assigned to him.  No Hedwig Village or Spring Valley police officer ordered nor suggested to me that the canine assault Mr. Ballard.

take commands only from its handler or trainer.  (Docket Entries No.52-17, page 6; No.52-18, page 6).   Given the short time frame and the dog's inability to understand English or take directives from anyone other than Neck, the attending officers did not have a reasonable opportunity to intervene in the alleged attack.

Insofar as plaintiff alleges that Lusk, Schulgen, or any other attending officer verbally abused him during the arrest, his claim lacks an arguable basis in law.  Verbal abuse or harassment, standing alone, is not actionable under § 1983 as a violation of constitutional rights. *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) (citing *Bender v. Brumley*, 1 F.3d 271, 274 n. 4 (5th Cir.1993)).   Racial epithets that accompany harassment or some other violation of constitutional rights may amount to a separate equal protection violation and may be strong evidence that a comment or action is racially motivated if the action deprives a person of equal protection of the laws.  *Williams v. Kaufman Cty*., 352 F.3d 994, 1012 (5th Cir. 2003).   However, where the conduct at issue consists solely of speech, there is no equal protection violation. *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir.), *clarified on rehearing*, 186 F.3d 633 (5th Cir. 1999).   In this case, plaintiff states in his deposition that "[n]o officer physically did anything to me."  (Docket Entries No.56-9, page 9; No.50-5, pages 12-13).   Therefore, plaintiff fails to state an actionable constitutional claim against these officers.

Defendants Lusk, Schulgen and the other attending officers are entitled to summary judgment on this claim.

---

(Docket Entry No.52-17, page 6).

<u>Medical Care</u>

Plaintiff claims that he did not receive medical treatment for the dog bites for sixteen hours[9] even though he requested care.  (Docket Entry No.56-8, page 19).  He further claims that because of the delay, medical personnel could not stitch his wounds and warned him that such wounds would leave large keloids on his leg.  (Docket Entries No.17, pages 10-12; No.56-9, page 7).

Because plaintiff's claims pertain to his status as a pretrial detainee, his constitutional rights related to conditions of confinement arise from "the procedural and substantive due process guarantees of the Fourteenth Amendment."  *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (recognizing differences between alleged violations of the Eighth and Fourteenth Amendments).  Liability for alleged violations of a detainee's rights by state officials can be premised on two theories of recovery: (1) that the conditions of confinement violated the detainee's rights or (2) that episodic acts or omissions of the officials violated the detainee's rights.  *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc).

Plaintiff's complaints do not attack rules or conditions at the HV Jail, but rather concern the acts or omissions of individual officers that delayed medical treatment.  Thus, these claims will be analyzed under the "episodic act or omission" standard.  Under such standard, a jail official cannot be held liable "unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk."  *Hare*, 74 F.3d at 650.  In other words, the detainee must establish that the official acted with subjective deliberate indifference as established in *Farmer v. Brennan*, 511 U.S. 825 (1994).  *Cf.*

---

[9] Plaintiff complains that HVPD Officer Lusk, HVPD Detective Steven Wayne Packard, and SVPD Sgt. W.G. Obenland denied him medical treatment following his arrest on September 23, 2007.  (Docket Entries No.17, pages 3-5; 8-14).

*Flores v. County of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997).  The mere delay of medical care can also constitute a constitutional violation, but only if the official causing such delay acted with deliberate indifference that results in substantial harm.  *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).  To establish deliberate indifference, the plaintiff must show that a state official knew that the plaintiff "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."  *Farmer*, 511 U.S. at 847.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.* at 837.

Although plaintiff claims otherwise,[10] the uncontravened Ambulance Record from the Village Fire Department reflects that plaintiff received care for the dog bite wounds from paramedics at the scene.  Medics James Nusser and Michael Hebert were dispatched at 2:18 a.m. to the office building on the complaint of a dog bite.  (Docket Entry No.70, page 6).  Within minutes, they conducted their initial assessment and administered wound care; they departed the location at 2:34 a.m.  (*Id.*, page 7).  Medic Nusser reported his observations as follows, in pertinent part:

> Bleeding was controlled and the wound(s) were cleaned and dressed.  Obtained signed refusal form from patient/Legal Guardian.  Patient was custody of HVPD.  Patient apparently sustained a police dog bite to his right calf.  Small abrasions and a puncture wound were cleaned and dressed with 4 x 4's and kerlix.  Patient was kept in the custody of HVPD.

---

[10] According to plaintiff, paramedics at the scene did not clean his wounds but wrapped gauze around them.  (Docket Entry No.56-8, page 10).  One paramedic told plaintiff that the wounds would require stitches and that he could not give plaintiff pain medication because he was not a doctor.  (*Id.*).  One paramedic informed nearby officers that plaintiff would require further medical care and most likely stitches.  (*Id.*, page 40).  The paramedics left plaintiff in the care of an unnamed officer who promised to take care of him.  (*Id.*, page 10).

22

(*Id.*).  The HVPD and HPD Incident Reports also show that paramedics treated plaintiff at the scene.[11]  (Docket Entries No.52-4, page 6; No.52-14, page 1).  Plaintiff acknowledges that he did not tell the police officers at the scene that he needed medical attention because he assumed that he was going to be transported for further medial treatment.  (Docket Entry No.56-8, page 40).

The undisputed record shows that plaintiff did not receive medical care while detained in the HV Jail.  According to plaintiff, he asked to see a doctor and to receive pain medication from HVPD Officer Lusk around 2:00 or 2:30 a.m.,[12] from Sgt. Obenland[13]

---

[11] Plaintiff states that he did not sign a refusal to receive treatment and that he would not sign the same because he was in a lot of pain.  (Docket Entry No.56-8, page 15).  The refusal form is not in the record.

[12] Plaintiff states that Officer Lusk promised that plaintiff would see a doctor once he got to the HC Jail and that would be shortly.  (Docket Entry No.56-11, page 13).  After numerous requests for pain medication, Lusk told plaintiff to quit asking; Lusk indicated that he knew that plaintiff was in pain because he had been bitten by a dog before.  (Docket Entry No.56-11, page 14).

Officer Lusk, who transported plaintiff to the HV Jail, attests that plaintiff did not request additional medical treatment other than the EMS treatment that he had received and plaintiff did not complain that he was in pain and did not appear to be in severe pain.  (Docket Entry No.50, page 3).  (*Id.*).  Lusk attests that pursuant to Hedwig Village policy, the HVPD would have requested additional medical assistance if plaintiff appeared to need it or had requested it.  (*Id.*).

[13] Plaintiff complains that SVPD Sgt. Obenland "tortured" him when Obenland pulled him from his cell in the HV Jail, made him stand on his injured leg, and took photographs of him. (Docket Entry No.56-8, page 16).  Plaintiff indicates that he requested medical treatment before, during, and after Obenland photographed him.  (*Id.*, page 17).  Plaintiff states that his wounds were still bleeding and that the blood had soaked through the gauze and was dripping down his leg when he walked from his cell to the area where he was photographed, but there was no blood on the floor.  (*Id.*, page 18).

Obenland attests that he met with plaintiff at the HV Jail, where he took several photographs for SVPD's investigation of a prior burglary at another location in the area.  (Docket Entry No.50-03, page 3).  Obenland did not notice any dripping, flowing, or gushing blood or blood-soaked bandages or clothing from plaintiff's wound.  (*Id.*).  He did not observe plaintiff limping or complaining of pain or requesting medical attention.  (*Id.*).  Obenland attests that he read plaintiff the *Miranda* warning at 4:48 a.m., and attempted to question him but plaintiff indicated that he did not want to talk to Obenland until he could confer with an attorney.  (*Id.*).  Thereafter, Obenland concluded his efforts to talk with plaintiff about the other robbery.  (*Id.*).

Plaintiff also complains that Obenland was verbally abusive when he questioned plaintiff at the HV Jail.  (Docket Entry No.56-10, page 14).  When plaintiff made an offensive hand gesture toward Obenland, Obenland threatened to "get him."  (Docket Entry No.50-5, page 24).  Plaintiff concedes that Obenland did not exercise any physical force against him.  (Docket Entry No.56-10, page 17).  Obenland denies cursing or using profanity.  (Docket Entry No.50-03, page 3).

23

sometime thereafter, and from Detective Packard[14] around 7:00 a.m. but his pleas were ignored or rebuffed.  (Docket Entries No.56-8, page 16).  The record, however, shows that plaintiff indicated on the HVPD Prisoner Medical Survey, upon which his signature appears, that he was not experiencing physical pain and did not have a condition that required immediate medical attention.  (Docket Entries No.14, page 10; No.56-6, page 8).  Plaintiff disputes whether the signature is his although he does recall signing something at the jail.

The undisputed record also shows that the HC Jail would not admit plaintiff until he had been examined by medical personnel at Ben Taub Hospital.  Plaintiff claims when he arrived at the HC Jail, the jailer saw that his leg was still bleeding and called medical.  (Docket Entry No.56-11, page 11).  However, in a supplement to the HVPD Incident Report, HVPD Officer Wright reported that around 12:30 p.m. on September 23, 2007, he transferred plaintiff to the HC Jail, where the on-duty nurse looked at plaintiff's wound and advised that plaintiff be transported to Ben Taub Hospital for stitches before he would be accepted at the jail.  (Docket Entries No.14, page 15; No.56-6, page 9).  Wright transported plaintiff to the hospital and waited with him in the emergency room until he was relieved by another officer at 2:00 p.m.  (Docket Entry No.50-4, pages 5-6).  Wright attests that at no time while plaintiff was in his custody did he observe plaintiff need any assistance walking, complaining of pain or discomfort, speaking of

---

[14] Plaintiff states Detective Packard also knew he was in pain and that he had requested medical assistance, but Packard made him walk from his cell to the kitchen and then stand on his injured leg.  (Docket Entry No.56-11, pages 2-3).  Plaintiff claims that Packard even commented that plaintiff's leg looked bad.  (Docket Entry No.11, page 14).  Plaintiff asked when he would get a doctor, to which Packard replied when he was through talking with him.  (*Id*.).  Packard tried to ask plaintiff questions as they walked down the hall and told plaintiff that plaintiff was too smart to answer his questions.  He then put plaintiff back into the cell.  (*Id*.).

Packard attests that plaintiff required no assistance in walking to and from his cell and that he did not request medical assistance and did not appear to need medical assistance.  (Docket Entry No.50, pages 8-9).  Packard did not observe any blood-soaked bandage or dripping blood.  (*Id.*).

his injury, or requesting medical attention.  (*Id.*).  The HVPD officers who relieved Wright also reported that they did not hear plaintiff complain of pain or discomfort.[15]

Plaintiff, however, maintains that because of the delay in receiving medical attention, he developed keloids on his legs, from which he will experience pain and discomfort for the rest of his life and that will require multiple surgical operations to remove.[16]  (Docket Entries No. 17, pages 11-12; No.56-9, page 7).  Plaintiff' reports that his puncture wounds from the dog bite did not result in keloids when the wounds were initially treated by HC Jail medical personnel.  (Docket Entry No.56-10, page 8).  Plaintiff indicates that he later saw medical personnel at the HC Jail for itching and pain from the keloid scarring but they told him there was nothing they could do.[17]  (*Id.*, page 9).

The record, however, does not show that any defendant knew that plaintiff faced a substantial risk of serious harm from the dog bite wounds.  The two small puncture wounds had been cleaned and bandaged by paramedics who released plaintiff to the police officers.  Plaintiff did not complain to officers at the scene of the burglary that he was in pain or needed additional treatment.  Although plaintiff claims he requested medical treatment while detained in HV Jail,

---

[15] HVPD Officer Carlos Gallo, who relieved Officer Wright at the hospital, observed medical personnel clean the wound but did not seek any blood gushing, flowing, or dripping around the wound.  (Docket Entry No.50-4, pages 1-2).  Gallo observed plaintiff eat lunch with no complaints.  (*Id.*, page 2).  Gallo attests that plaintiff slept most of the time he was in custody and did not complain of any pain or discomfort.  (*Id.*).

HVPD Officer Jaime Exley relieved Gallo at the hospital around 10:30 p.m. on September 23, 2007.  (Docket Entry No.50-4, page 3).  She observed plaintiff restrained to a bed with handcuffs, awaiting discharge papers from the hospital.  (*Id.*).  Hours later, Exley transported plaintiff to the HC Jail, where plaintiff was pronounced "fit for jail" and accepted into the jail.  (*Id.*, pages 3-4).  Exley did not observe plaintiff complain of any pain or discomfort and did not observe that plaintiff required assistance walking.  (*Id.*).

[16] Plaintiff alleges that "two doctors . . . said my wounds were severe and that they ordinarily would stitch them close[d].  But because of the delay in medical treatment the chances of infection increased dramatically and would leave large keloids on my leg."  (Docket Entry No. 17, pages 10-11).

[17] A HC Jail Health Assessment dated September 19, 2008, reflects that plaintiff suffered from keloids to his chest.  (Docket Entry No.59-4, pages 10-11).  Plaintiff's medical records reflect that he has suffered from keloid scarring since at least August 5, 2005.  (Docket Entry No.59-3, page 1).

he also signed a form at the jail stating that he did not require medical care.  Even if the officers

knew that plaintiff was in pain, that his wounds were open and bleeding, and that he had

requested further medical treatment, plaintiff states no facts to show that the officers knew or

inferred by these facts that plaintiff faced a risk of substantial harm from delaying medical

treatment, *i.e.*, that he would develop keloids after the wounds had healed.  Without a showing of

deliberate indifference, defendants are entitled to summary judgment on this claim.

<u>28 U.S.C. § 1915(e)(2)(B)</u>

When a litigant proceeds *in forma pauperis*, the district court may scrutinize the

basis of the complaint and, if appropriate, dismiss the case without service of process if the claim

is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary

relief from a defendant who is immune from such relief.  42 U.S.C. § 1997(e)(c) and 28 U.S.C. §

1915(e)(2)(B).  An action is frivolous if it lacks any arguable basis in law or fact.  *Neitzke v.*

*Williams*, 490 U.S. 319, 325 (1989); *Talib v. Gilley*, 138 F.3d 211, 213 (5th Cir. 1998).  "A

complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory,

such as if the complaint alleges violation of a legal interest which clearly does not exist."  *Harris*

*v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999) (citing *Harper v. Showers*, 174 F.3d 716, 718

(5th Cir. 1999) (quoting *Davis v. Scott*, 157 F.3d 1003, 1005 (5th Cir. 1998)).  A complaint fails

to state a claim if the plaintiff fails to plead "enough facts to state a claim to relief that is

plausible on its face."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Erickson v.*

*Pardus,* 551 U.S. 89, 93 (2007).  Although material allegations in the complaint must be

accepted as true and construed in the light most favorable to the nonmoving party, a court is not

required to accept conclusory legal allegations cast in the form of factual allegations if those

conclusions cannot reasonably be drawn from the factual allegations. *Twombly*, 550 U.S. at 555 (noting that "[f]actual allegations must be enough to raise a right to relief above the speculative level).

<u>Police Chiefs</u>

A supervisory official, such as a police chief, may not be held liable under a respondeat superior or vicarious liability theory alone. *See Reimer v. Smith*, 663 F.2d 1316, 1323 (5th Cir. 1981). To incur liability, a police chief (1) must be either personally involved in the acts causing the deprivation of a person's constitutional rights, or (2)(a) the chief failed to train or supervise the officers involved; (b) there is a causal connection between the alleged violation of the plaintiff's rights; and (c) the failure to train or supervise constitutes deliberate indifference to the plaintiff's constitutional rights. *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001).

> Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference. . . . The plaintiff must generally demonstrate at least a pattern of similar violations. . . . Furthermore, the inadequacy of training must be obvious and obviously likely to result in a constitutional violation.

*Id*. (citations omitted).

In this case, the allegations against Police Chiefs Harold Hurtt, Dave M. Barber, Gary Finkleman, and John Doe, in their individual capacities are general and conclusory and therefore, insufficient to state a claim. Therefore, plaintiff's claims against these defendants are subject to dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B).

To the extent that plaintiff sues the police chiefs in their official capacities, his claims are treated as suits against the cities by which they are employed.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

<u>Municipal Liability</u>

A governmental entity can be sued and subjected to monetary damages and injunctive relief under section 1983 only if its official policy or custom causes a person to be deprived of a federally protected right.  *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  A municipality may not be held liable under section 1983 on the basis of *respondeat superior* or vicarious liability.  *Id.*  Municipal liability under a section 1983 claim requires proof of (1) a policy maker; (2) an official policy; and (3) a violation of a constitutional right whose moving force is the policy or custom.  These three elements are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself.  *Id.*  In the instant case, the cities can only be liable to plaintiff is there is either an unconstitutional action by an official policy maker or a policy or custom that caused the deprivation of his constitutional right.  *See id.* at 694; *Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force*, 379 F.3d 293, 309 (5th Cir. 2004).  In absence of a constitutional violation, the question of municipal liability is moot.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Municipal policy for purposes of section 1983 liability may consist of:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is

> so common and well settled as to constitute a custom that fairly represents
> municipal policy.  Actual or constructive knowledge of such custom must
> be attributable to the governing body of the municipality or to an official
> to whom that body had delegated policy-making authority.

*Johnson*, 379 F.3d at 309 (quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992)).  For a municipality to be liable on account of its policy, the plaintiff must show that either (1) the policy itself violated federal law and authorized or directed the deprivation of federal rights or (2) the policy was adopted or maintained by the municipality's policymakers "with 'deliberate indifference" as to its known or obvious consequences. . . A showing of simple or even heightened negligence will not suffice." *Id.* quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997).  Plaintiff has not alleged nor presented any evidence of a formal or official policy by the cities; nor has he alleged and shown a longstanding custom and practice of excessive force by officers effectuating an arrest with a canine or depriving an injured detainee with medical care that was adopted or maintained by the cities' policymakers with deliberate indifference to its known or obvious consequences.  Plaintiff has not even pled a pattern of similar violations or incidents that would suggest that a policy has been adopted and maintained with deliberate indifference to constitutional rights.  *See Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003).  In any event, plaintiff fails to state facts to show that any city policy regarding medical care or excessive force or a police chief's failure-to-train or supervise was the moving force behind the alleged violations.  *See Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) (noting that "a direct causal connection must exist between the policy and the alleged constitutional deprivation").

Accordingly, the Court will dismiss plaintiff's claims against the cities of Houston, Hedwig Village, Spring Valley, and Memorial Villages pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim.

<u>Other Officers</u>

Plaintiff makes no factual allegations against Officers Kincaid, Webb, and John Does; therefore, all of plaintiff's conclusory claims against them are subject to dismissal as frivolous.

<u>CONCLUSION</u>

Based on the foregoing, the Court ORDERS the following:

1. Plaintiff's Motion for the Appointment of Counsel (Docket Entry No.27) is DENIED, without prejudice, for the reasons stated in the Court's Order of June 3, 2008.  (Docket Entry No.11).

2. Defendants' Motion for Leave to File Medical Records (Docket Entry No.51) is GRANTED.

3. Defendants Dale Edward Lusk, Steven Wayne Packard, and Frank Schulgen's Motion for Summary Judgment (Docket Entry No.48) is GRANTED.   All claims against defendants Lusk, Packard, and Schulgen are DISMISSED WITH PREJUDICE.

4. Defendant D.R. Neck's Motion for Summary Judgment (Docket Entry No.52) and Supplemental Motions for Summary Judgment (Docket Entries No.54, No.59) are GRANTED, in part and DENIED, in part. Defendant Neck's Motions for Summary Judgment are GRANTED as to plaintiff's conspiracy claim and DENIED as to defendant Neck's defense of qualified immunity on plaintiff's excessive force claim.

5. Plaintiff's Motion for Summary Judgment (Docket Entry No.56) is DENIED..

6. All claims asserted by plaintiff against all other defendants, except the excessive force claim against defendant D.R. Neck, are DISMISSED WITH PREJUDICE, pursuant to 28 U.S.C. § 1915(e)(2)(B).

Plaintiff's excessive force claim against defendant Neck is RETAINED.

7.   All other pending motions are DENIED AS MOOT.

The Clerk will provide a copy of this order by facsimile transmission, regular mail, or e-mail to the parties and to TDCJ - Office of the General Counsel, Capitol Station, P.O. Box 13084, Austin, Texas, 78711, Fax: 512-936-2159; the Inmate Trust Fund, P.O. Box 629, Huntsville, Texas 77342-0629, Fax: 936-437-4793; and the District Clerk for the Eastern District of Texas, 211 West Ferguson, Tyler, Texas  75702, Attention: Manager of the Three-strikes List.

SIGNED at Houston, Texas, this 2nd day of September, 2009.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE